UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN TYLER H., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, Acting Commissioner of Social Security, <br><br> Defendant. | Case No. 2:22-cv-07857-KES <br><br> MEMORANDUM OPINION AND ORDER |

**I.**

**INTRODUCTION**

On October 27, 2022, Plaintiff Justin Tyler H. ("Plaintiff") filed a Complaint for review of denial of social security disability benefits. (Dkt. 1.) Plaintiff filed Plaintiff's Brief ("PB") under the Rule 6 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g). (Dkt. 16.) Defendant filed a responding Commissioner's Brief ("CB") under the Rule 7. (Dkt. 23.) Plaintiff did not timely reply. (Dkt. 20.)

For the reasons stated below, the Commissioner's decision denying benefits is VACATED.

## II.

## BACKGROUND

In January and February 2020, Plaintiff applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, alleging a disability onset date of December 5, 2017, at age 22, when he suffered a motor vehicle accident while delivering pizza. Administrative Record ("AR") 24, 235-39, 406. On September 14, 2021, an Administrative Law Judge ("ALJ") conducted a telephonic hearing at which Plaintiff, who was represented by counsel, appeared and testified, along with a vocational expert ("VE"). AR 31-50.

On October 15, 2021, the ALJ issued an unfavorable decision. AR 12-30. First, the ALJ determined that Plaintiff's last date insured ("LDI") was September 30, 2018, such that Plaintiff needed to establish disability on or before that date to receive DIB benefits.[1] AR 17. Next, the ALJ determined that Plaintiff suffered from the severe, medically determinable impairments ("MDIs") of "mental impairments variously diagnosed as bipolar disorder, depressive disorder, anxiety, and attention deficit hyperactivity disorder." AR 17. The ALJ found that despite these impairments, Plaintiff had the residual functional capacity ("RFC") to perform work at all exertional levels with the following mental limitations:

> He is limited to simple, routine, and repetitive tasks with few, if any, workplace changes. He can remember, understand, and carry out simple instructions and make commensurate work-related decisions.

---

[1] DIB Title II benefits provides benefits to insured individuals based on their earnings records. Benefits predating their application are potentially available if disability is established prior to the claimant's LDI. In contrast, Title XVI SSI benefits are need-based and consider whether the claimant was disabled as of the date of the application; no pre-application benefits are available. See Wellington v. Berryhill, 878 F.3d 867, 872.

  He can respond appropriately to supervision, coworkers and work situations and deal with routine changes and work setting. He can maintain concentration, persistence, and pace for up to, and including, 2 hours at a time with normal breaks throughout a normal workday.

AR 20.

  Plaintiff had no past relevant work. AR 24. Based on the RFC findings, the VE's testimony, and other evidence, the ALJ found that Plaintiff could work as a garment sorter, ticket taker, and linen sorter. AR 25. The ALJ concluded that Plaintiff was not disabled. AR 25.

## III.
## ISSUES PRESENTED

  <u>Issue One</u>: Whether the ALJ erred in evaluating the medical opinion evidence, such that her finding that Plaintiff "can respond appropriately to supervision [and] coworkers" lacks substantial evidentiary support. (PB at 2.)

  <u>Issue Two</u>: Whether the ALJ erred in discounting Plaintiff's symptom testimony. (<u>Id.</u>)

## IV.
## DISCUSSION

**A. ISSUE ONE: The Medical Opinion Evidence.**

  **1. Summary of the Opinion Evidence.**

  Plaintiff's Brief discusses three treating sources[2] who opined that Plaintiff's ability to interact with others was impaired: (1) psychiatrist, Michael G. Golder, M.D.; (2) Licensed Marriage & Family Therapist ("LMFT") Ritsa Tsangarides;

---

[2] A fourth treating source, Sharon Furman, Psy.D., performed multiple psychological evaluations for purposes of Plaintiff's worker's compensation claim. AR 405-35. On appeal, Plaintiff did not challenge the ALJ's evaluation of her opinions, so they are not discussed herein.

and (3) psychological consultative examiner, Amber Ruddock, Ph.D.

Dr. Golder treated Plaintiff for approximately three years. AR 345 ("In December 2020, the claimant's treating psychiatrist, Dr. Michael Golder, M.D., completed a medical source statement wherein he opined that as early as February 2017 …"). In December 2020, he completed a Medical Source Statement ("MSS"). As relevant here, he opined that Plaintiff would have "marked" difficulty interacting appropriately with members of the public, supervisors, and co-workers. AR 471.

Ms. Tsangarides had counselling sessions with Plaintiff regularly between September 2019 and November 2021. AR 490-91. In an undated letter, she wrote that Plaintiff "struggles with serious issues of social anxiety and depression." AR 458. He experienced highs and lows when he was unable to leave his home, and he depended on his father with whom he lived for his basic needs. AR 458. He "suffers from issues of reality versus fantasy," was taking "a lot of various medications," and was "severely malnourished" due to refusing to eat. AR 458. On August 25, 2021, she wrote a second letter describing Plaintiff's struggles with social functioning as follows:

> Client … will ramble on and on without the ability to self-regulate or allow others to engage in conversation. Client struggles with rules and had breakdowns when things changed on him or if he was asked to do something he did not want to do. Client has a very rigid and fixated way he feels that he needs to do things and he will get upset or set off when he is out of his comfort zone which is his room. Client had a difficult time with his parents' divorce and selling the house to the point where he expressed anger and resistance to the change. At this time it appears the only person who can calm him down is his father. Therapist was working on getting the father to back off and help his son self-regulate and process issues on his own.

>Client was not suicidal or homicidal, but would discuss how other would irritate him and how he would get angry and want to explode. Client …would verbally attack his father …. Client would struggle with relationships and will not pick up on social cues. He will act out if faced with a situation that he feels threatened in or feels not validated.

AR 491.

On July 15, 2020, Plaintiff underwent a psychological evaluation with Dr. Ruddock. AR 437-441. Dr. Ruddock observed that he was accompanied by his father and appeared underweight with poor grooming. AR 437. She opined, "The claimant presented with a history of interpersonal difficulties and was socially reserved with this examiner. He presented with moderate difficulty to interact appropriately with supervisors, coworkers, and peers on a consistent basis." AR 441.

In addition to these three treating sources, State agency consultant H. Amado, Psy.D., found that Plaintiff would have "mild" difficulty interacting with others and "moderate" difficulty adapting and managing himself. AR 57. When asked if Plaintiff had "social interaction limitations," Dr. Amado responded, "yes," but then indicated that Plaintiff's ability to engage in appropriate social interactions was "not significantly limited." AR 60. He explained that Plaintiff "appears reserved and withdrawn but able to get along with other people," an apparent reference to Dr. Ruddock's observations. AR 60. On reconsideration, State agency consultant R. Pereyra, Psy.D., wrote, "Letter from therapist noting the severity of his [symptoms] is not reflected in the therapy notes." AR 87. Dr. Pereyra repeated Dr. Amado's mental RFC findings. AR 92-93.

### 2. The ALJ's Evaluation of the Opinion Evidence.

The ALJ found the State agency consultants' opinions persuasive. AR 19. The ALJ rejected all three treating sources' opinions about Plaintiff's social

limitations and instead found that despite "mild" limitations in social interactions, he could "respond appropriately to supervision" and "coworkers." AR 18, 20. The ALJ generally reasoned that Plaintiff's ability to attend school and work in food delivery demonstrated "the ability to interact with others." AR 21.

The ALJ rejected Dr. Ruddock's opinions about Plaintiff's social limitations because Plaintiff "reported socializing with family on a regular basis. (5F/3 [AR 438]) He could attend doctor appointments and deal appropriately with authority figures. (5E [AR 292-303]) He was also capable of having some meaningful interpersonal relationships. (2F/9, 11 [AR 371, 373]) These evidence belie the assessment of difficulty interacting with supervisors and co-workers on a consistent basis." AR 22.

As for Dr. Golder, the ALJ found his MSS "overly restrictive in part, namely the assessment of public, supervisor, and co-worker interactions, given the medical evidence of record. Again, evidence of the claimant regularly socializing with family, his attendance at therapy and other medical appointments, his ability to deal appropriately with authority figures and his ability to have meaningful interpersonal relationships do not support marked limitations in interacting. (5F/3; 5E; 2F/9, 11)." AR 22-23.

Finally, the ALJ found Ms. Tsangarides's letters only "persuasive in part" because:

> there is evidence the claimant regularly socialized with family and attended therapy and other medical appointments. He reported being able to deal appropriately with authority figures, and was found to have the capacity for meaningful interpersonal relationships. (5F/3; 5E; 2F/9, 11 [AR 438; AR 292-303; AR 371, 373]) These evidence support an ability to interact with co-workers and supervisors.

AR 23.

### 3. Evidence of Plaintiff's Social Functioning.

As summarized above, the ALJ rejected the treating sources' opinions regarding the degree of Plaintiff's difficulty with social functioning based on evidence that he socialized with this family and others, acted appropriately at medical appointments, and interacted appropriately with others at work and school. Plaintiff contends that the cited evidence does not show that he had no significant difficulties with social functioning, and that the opinions of his treating sources are well supported and consistent. The Court, therefore, summarizes below the evidence about Plaintiff's social functioning in these areas.

    a. Socializing with Family Members.

On March 20, 2018, Plaintiff was hospitalized for three days as a danger to others after he "reportedly threatened to kill his brother … and reportedly destroyed his brother's car the day prior." AR 353-54. Hospital staff described him as "very disinhibited, labile, and erratic" and "extremely immature." AR 353-54.

In January 2019, Plaintiff reported that he lived with his parents and sister and was very close to his father, but he did "not get along so well with his mother." AR 406. He no longer felt as aggressive towards his brother. AR 408.

In June 2019, Plaintiff told Dr. Golder that he "hates" his mother. AR 382. By July 2019, Plaintiff reported sedating himself with cannabis so as not to over-react to his mother's perceived critical behavior. AR 385. He reported "irritability and rage" with his mother as the source. AR 387.

In September 2019, Plaintiff reported "being angry with multiple people around him and calls it their fault …." AR 391. Consistent with this, in February 2020, Plaintiff's father reported, "When he gets mad at us he obsesses on it for days and stays angry for days." AR 289. "He lives in a fantasy world in his room." AR 291.

In June 2020, Plaintiff told his therapist that he wanted to be more

independent, but his family would not let him.  AR 466.

In July 2020, Plaintiff told Dr. Ruddock that he "socializes with family on a regular basis."  AR 438.

In September and October 2020, Plaintiff complained in therapy of frustration with his parents and wanting "family therapy" due to "divorce issues." AR 455, 462.  In March 2021, he was still having anger spells with his family.  AR 478.  In July 2021, he was arguing with his father.  AR 475.  In August 2021, Plaintiff attributed his recent anxiety to his father whom he considered mentally ill and "hypocritical."  AR 473.  Both Plaintiff's mother and brother have mental illness.  AR 484.

In September 2021, Plaintiff lived with his father.  AR 41.  Per Plaintiff's father, Plaintiff would watch television with family members "if we come to his room."  AR 288.  Plaintiff reported that he watched TV with his dad.  AR 300.

        b.     Socializing with Others.

While working as a pizza delivery driver in 2017 before his alleged onset date, Plaintiff got along well with his managers and coworkers.  AR 409.  After the December 2017 car accident, however, his psychological condition deteriorated, and he "was not getting along with anyone."  AR 410.

In July 2018, Dr. Golder assessed a GAF score of 51-60 consistent with "moderate difficulty with peers or co-workers."  AR 369.  In November 2018, Dr. Golder assessed a higher GAF score consistent with "some difficulty in social …function … but generally functioning pretty well."  AR 371; see also AR 373 (same on 1/2/19); AR 379 (GAF back down to 51-60 on 4/29/19); AR 381, 382 (still 51-60 on 6/19/19 and 6/26/19); AR 386 (same on 7/23/19); AR 388 (higher GAF on 7/24/19); AR 382 (GAF back down to 51-60 on 9/11/19); AR 395 (higher GAF score on 1/23/20).

In January 2019, Plaintiff reported that "he does not have many friends." AR 408.  He "lost many of his friends after he and his girlfriend broke up" when

8

he was 17, but he still had "one best friend who he sees very regularly." AR 408, 412; AR 409 (he spent time with his close friend, Alex, two or three times a week). He played video games 5-6 hours per day. AR 409. His GAF score was 55. AR 414. He scored in the "severe" range on a standard anxiety test. AR 415.

In January 2020, Plaintiff told Dr. Golder that he was being harassed by a law firm. AR 395. In February 2020, Plaintiff's father reported that Plaintiff had "too much anxiety and depression on most days to leave the house," although he went outside to smoke. AR 284-85. Other than smoking, Plaintiff did not "go anywhere else alone" and "rarely drives." AR 287. Plaintiff also reported that he did not go anywhere regularly except medical appointments. AR 300. He reported anger and trouble getting along with others. AR 301. He could get along with authority figures "when they're kind to me." AR 302.

In April 2020 (shortly after the start of the COVID-19 pandemic), Plaintiff reported "not going out at all." AR 450. He was still "struggling to cope" in September 2020. AR 451. He had a GAF score indicating "generally functioning pretty well." AR 452.

        c.    Going to School.

Plaintiff reported that before his December 2017 car accident, he was "doing well in school and at work." AR 407. Plaintiff completed some community college. AR 37 (he completed one year); AR 408 (he attended from 2014 to 2016). He told the ALJ that he had a 3.0 grade point average, then corrected that to a 2.0 grade point average after questioning. He had dropped some classes that were marked as incomplete. AR 37-38. He told others that he was an "architecture student" and "doing very well in school and plans to become an actuary." AR 406, 408.

In July 2018, he told Dr. Golder that he planned to return to community college in August. AR 368. In November 2018, he repeated his plans to return to school. AR 370. In January 2019, he reported that he had dropped out of school

because he was afraid to drive himself there, even though he was only four classes away from completing his AA degree. AR 407.

In April 2019, Plaintiff again told Dr. Golder that he would register for school "in the near future." AR 378. In June 2019, however, he told Dr. Golder that he had abandoned plans to return to school because of mania. AR 382. By July 2019, he was "anxious about starting school again, but sees himself as having to." AR 387. In September 2019, he had not started school. AR 391.

Plaintiff started counseling with Ms. Tsangarides in October 2019. She opined that he needed to "work on his anxiety and depression in order to be able to function with daily life skills like attending school." AR 399.

In June 2020, Plaintiff told his therapist that he wanted "to start school with his Russian friend." AR 464. In July 2020, Plaintiff told Dr. Ruddock that he had been attending community college "just prior to the COVID-19 pandemic." AR 438. He reported "above average grades" and an intent to finish his AA degree "shortly." AR 438.

In October 2020, Plaintiff expressed concerns over his "inability to go to school." AR 459. He shot himself with a pellet gun, but his therapist assessed no suicidal ideation. AR 459. In August 2021, Plaintiff reported plans to resume community college in the fall. AR 473.

    d.  Working.

Plaintiff testified that his bipolar symptoms started in 2016 and worsened over time. AR 45. In 2016, Plaintiff worked six months as a retail cashier at Walmart. AR 257, 411. He was fired after he returned from a trip from Seattle due to a misunderstanding about his days off. AR 412. He worked from March-December 2017 doing food delivery. AR 257. These were part-time jobs. AR 270-72.

Plaintiff was in a car accident while working as a pizza delivery driver in December 2017. When he returned to work a few days after the accident, he was

terminated, but he could not remember why. AR 410. In January 2019, he reported that he "stays mostly at home, as he is afraid to go outside, and is too fearful to drive." AR 409.

In July 2020, however, he told Dr. Ruddock that he last worked as a pizza delivery driver in 2018. AR 438. Earnings records do not show any earnings in 2018. AR 241. In July 2021, he reported that he was excited to start driving again. AR 475. But at the hearing in September 2021, he testified that he still felt unable to drive. AR 40.

    e.  Attending Medical Appointments.

After the car accident, Plaintiff attended appointments for physical therapy and chiropractic treatment. AR 39. He had not received care for any physical health issues for two years prior to the hearing. AR 39.

At his appointments, Dr. Golder made mental status examination ("MSE") findings that Plaintiff was cooperative but had other symptoms that would impair socializing. See, e.g., AR 368 (7/12/18: "cooperative" but "solidly depressed, anhedonic, psychomotor retarded with low energy, difficulty concentrating"); AR 451-52 (9/20/20: "cooperative" but "struggling to cope with the world"); AR 478-79 (3/26/21: "cooperative" but "has again been having more anger spells"); AR 474 (8/17/21: "cooperative" but "speaks like a stoner").

Plaintiff's father accompanied him to many of his medical appointments, even those conducted via Zoom. See, e.g., AR 451, 477-78, 480, 482-83. During a video appointment, a treating source observed that Plaintiff "looked stoned." The doctor urged Plaintiff to stop using marijuana, but felt Plaintiff only paid "lip service" to that advice. AR 484-85. Plaintiff refused to appear by video at subsequent appointments, preventing the doctor from observing his appearance. AR 475.

  **4.**  **Analysis of Claimed Error.**

Regarding Plaintiff's family, the evidence does not show that Plaintiff could

get along with his family members to an extent that demonstrates an ability to get along with co-workers in a competitive work setting. Rather, he often reported conflict with his family. See, e.g., AR 21 ("He reportedly destroyed his brother's car and threatened to kill him"), 473 ("He views father's focus on pt's illness as 'hypocritical'"), 490 ("Client shared family concerns and many times reported high conflict with is mother"). His father echoed these reports. AR 289-90. While Plaintiff may have considered family members coming into his room to watch TV with him "socializing" when he told Dr. Ruddock that he socializes regularly with family members, that comment does not evidence an ability to get along with co-workers. See, e.g., William R. v. Comm'r of Soc. Sec., 3:19-cv-05609-BHS, 2020 U.S. Dist. LEXIS 14204 at *10, 2020 WL 428982 at *4 (W.D. Wash. Jan. 28, 2020) ("But playing games with a sibling and his roommate does not show that a person could interact with strangers or coworkers.").

Regarding work and school, Plaintiff had better functionality before the December 2017 car accident, which occurred before his claimed period of disability. While he repeatedly told his doctors that he planned to return to his studies, there is not substantial evidence in the record showing that he attended any community college classes after that accident. Similarly, there is not substantial evidence showing that he worked after December 2017. While he told Dr. Ruddock that he last worked as a pizza delivery driver in 2018 (AR 438), it appears Plaintiff misspoke as to the date when this comment is read in the context of the other evidence. The record very consistently reflects that after December 2017, Plaintiff had trouble leaving his house and generally only did so for medical appointments or errands with others. AR 287-89, 300, 475, 486. While Dr. Golder's GAF scores may have been inconsistent with "marked" social limitations, they still indicated a degree of difficulty getting along with others that might need to be accommodated in Plaintiff's RFC. While Plaintiff exhibited appropriate behavior at medical appointments, he was generally accompanied by his father.

That a young man acts appropriately with parental supervision is not a reliable predictor that he will act appropriately on his own.

Dr. Ruddock appears to have deliberately considered his opinions about Plaintiff's social limitations, because he put them in a separate paragraph. AR 441. His opinions are consistent with those of Dr. Golder and Ms. Tsangarides. They are not contradicted by the evidence cited by the ALJ. The ALJ did not adequately explain why the opinions of the State agency consultants (who relied on Dr. Ruddock's report but then disagreed with it) were more persuasive than Dr. Ruddock's.

Similarly, the ALJ acknowledged that Ms. Tsangarides had a lengthy counselling relationship with Plaintiff and expressed her opinions in detailed, written narratives rather than check-the-box forms. AR 23, 490-91. Her opinions were consistent with those of Drs. Golder and Ruddock. Again, the ALJ did not give reasons supported by substantial evidence for discounting Ms. Tsangarides's opinions about Plaintiff's social limitations.

## V.
## CONCLUSION

For the reasons stated above, IT IS ORDERED that Judgment be entered VACATING the decision of the Commissioner denying benefits and REMANDING this case for further administrative proceedings. On remand, the ALJ may wish to consider Plaintiff's other claims of error.

DATED: July 28, 2023

_____
KAREN E. SCOTT
United States Magistrate Judge